14 m J 7159  JCB
14 m J 7160  JCB

## AFFIDAVIT OF SPECIAL AGENT JASON D. COSTELLO

I, Jason D. Costello, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I joined the FBI in July 2004. From December 2004 through July 2010, I was assigned to the Violent Crimes Task Force of the FBI's Boston Division. Since August 2010, I have been assigned to the Boston Division's Organized Crime Task Force ("OCTF"). My primary duties on the OCTF include the investigation of Eurasian criminal enterprises, especially Balkan criminal organizations.

2.    I file this affidavit for two reasons. First, this affidavit is filed in support of a criminal complaint charging GJERJI PELUSHI, a/k/a GJERGJ PELUSHI, a/k/a GEORGE PELUSHI (hereinafter "PELUSHI") with two counts of impersonation of an officer or employee of the United States, in violation of Title 18, United States Code, Section 912, a statute that makes it a crime to "falsely assume[] or pretend[] to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and act[] as such, or in such pretended character [to] demand[] or obtain[] any money, paper, document, or thing of value." Based on the information contained herein, I submit there is probable cause to believe

that PELUSHI committed the crimes set forth in the accompanying criminal complaint.

3.    Second, this affidavit is filed in support of an application for a search warrant authorizing the search of PELUSHI's bedroom and the common areas located inside 282 Main Street, Apartment 1B, Melrose, Massachusetts, as well as any storage areas for Apartment 1B located at 282 Main Street (hereinafter, the "Target Premises").  I submit that there is probable cause to believe that a cellular telephone used in the commission of the offense with telephone number 781-350-8054 (hereinafter, the "8054 Number"), a computer used in commission of the offense, documents used in the commission of the offense, and U.S. currency – including serialized official government currency ("OGC") provided to PELUSHI during this investigation – are located in the Target Premises.  As is discussed below, PELUSHI's parents live at the Target Premises and I do not seek permission to search their bedroom.

4.    I participated in the investigation of PELUSHI.  The facts relayed herein are based upon my participation in this investigation, my reviews of documents, reports and draft transcripts, and my discussions about the investigation with other law enforcement officers.  In submitting this affidavit, I have not included every fact known to me about the

2

investigation, but only those facts which I believe are sufficient to establish probable cause.

## DESCRIPTION OF THE TARGET PREMISES

5.    I have observed the Target Premises.  The Target Premises are described below and are also described in Attachment A (along with an accompanying photograph), which is attached hereto and incorporated by reference:

> 282 Main Street, Melrose, Massachusetts is a red brick, four-story, multi-family apartment building. The main entrance to the apartment building is a clear glass door in the middle of the building accessed from a concrete sidewalk off of Main Street.  Inside the front door in the foyer of the building are a series of mailboxes.  The name "PELUSHI" is written over the mailbox for Apartment 1B.  As viewed from Main Street, Apartment 1B is located to the left of the front door, toward the back of the building, up a half-flight of stairs.  The door to Apartment 1B is gray in color and clearly marked "1B."  Inside Apartment 1B, I request permission to search PELUSHI's bedroom and the common areas of the apartment only.

## THE INVESTIGATION OF PELUSHI

6.    Earlier this year, I interviewed two victims, "Victim 1" and "Victim 2" (collectively the "Victims").[1]  Both Victims, like PELUSHI, are originally from Albania and met PELUSHI through common acquaintances that are from Albania.  In separate interviews, Victim 1 and Victim 2 told me that they had each paid thousands of dollars to PELUSHI.  Victim 1 paid PELUSHI because PELUSHI assured Victim 1 he could get Victim 1 a job in

---

[1]    I know the identities of Victim 1 and Victim 2 and have met with both of them in person.

law enforcement. After Victim 2 was arrested on a state assault charge, PELUSHI promised Victim 2 he could get the case dismissed. Victim 2 paid PELUSHI because PELUSHI indicated the money was going to a public official and attorney who would see to it that the complaining witness (his then-estranged wife) was deported. Victim 1 and Victim 2 each believed PELUSHI could help them because PELUSHI repeatedly told them he worked for the FBI and / or CIA.

7. As is discussed in more detail below, between March 2014 and June 2014, Victim 1 and Victim 2 engaged in consensually recorded telephone calls and meetings with PELUSHI. During these recorded calls and meetings, PELUSHI stated, among other things, that he was an "FBI counterintelligence" agent; confirmed that he had been paid approximately $20,000 by Victim 1 to train him for a job in law enforcement (and expressed regret over how long it was taking to secure the position); confirmed that he had been paid approximately $7,700 by Victim 2; been paid $1,500 in OGC from Victim 2, ostensibly to facilitate work on the deportation of Victim 2's wife; and claimed to have patrolled this year's Boston Marathon in plain clothes while armed -- PELUSHI told Victim 2 that "the Director" had told him and his fellow agents that if they "tell someone to stop and they reach for the bag, shoot them in the head!"

## PELUSHI'S SCAM OF VICTIM 1

8.    Victim 1 had a longstanding interest in securing a job in law enforcement.  For health reasons, Victim 1 believed it was unlikely he would become a law enforcement agent.  In late 2009, a mutual friend introduced Victim 1 to PELUSHI.  PELUSHI told Victim 1 he worked for the FBI in the "Counterintelligence Division" and assured Victim 1 he could get Victim 1 a job with the FBI notwithstanding Victim 1's health issues.

9.    Shortly after PELUSHI first told Victim 1 he could get him a job with the FBI, he took Victim 1 to meet a former military official (hereinafter "the Military Official") who was working at a local university (the "University").[2]  PELUSHI claimed that the Military Official was his handler and could vouch for him.  PELUSHI, Victim 1, and the Military Official met at the University.  While the Military Official never discussed a job for Victim 1, or PELUSHI's work with the FBI, Victim 1 took the location of the meeting and the Military Official's status as confirmation that PELUSHI was in fact an FBI agent (PELUSHI told Victim 1 that agents like the Military Official and PELUSHI did not discuss their work in public).  From 2009 to 2013, Victim 1 and PELUSHI met with the Military Official

---

[2]    I know the identity of, and have spoken with, the Military Official.

several times, though the conversations remained social and were
unrelated to law enforcement.

10.    Soon after the meeting, PELUSHI told Victim 1 that the
Military Official wanted Victim 1 to become "part of the team"
and that PELUSHI and Victim 1 were to be "partners."   PELUSHI
told Victim 1 he needed to get ready for his job by taking tests
for which Victim 1 would have to pay.   Over the course of three
years, Victim 1 paid PELUSHI approximately $20,000 and also gave
him a Toyota Avalon registered to Victim 1 as payment for
"training" him.

11.    Victim 1's on-the-job "training" consisted of
performing a number of tasks ordered by PELUSHI.   The tasks
appeared legitimate to Victim 1 because they were often linked
to meetings where PELUSHI met with people who appeared to hold
important positions in government or law enforcement.

12.    In late 2010 and 2011, at PELUSHI's direction, Victim
1 selected an individual listed on the Massachusetts sex
offender registry list and conducted periodic "surveillance" of
the individual for many months.   Victim 1 conducted surveillance
of the individual in both Massachusetts and Rhode Island.

13.    Also in early 2011, at PELUSHI's direction, Victim 1
conducted periodic "surveillance" of a local mosque and wrote
down the license plates of cars from New York and New Jersey.
In March 2011, Victim 1 drove PELUSHI to New York so that

PELUSHI could meet with his contacts at the "Joint Terrorism Task Force" and report his "findings" regarding the mosque. Victim 1 was required to cover the expense of the trip.

14.   Later in 2011, Victim 1 introduced PELUSHI to a Lieutenant with a local police department (hereinafter, the "Lieutenant").[3] Victim 1 met the Lieutenant while taking a class.  During this meeting, Victim 1 heard PELUSHI tell the Lieutenant that he worked for the Defense Intelligence Agency ("DIA").[4] After the meeting, PELUSHI told Victim 1 that he and the Military Official actually worked for the Central Intelligence Agency ("CIA").

15.   Later that year, PELUSHI told Victim 1 that the Lieutenant had passed on a tip that several individuals in Somerville were "potential terrorists."  PELUSHI provided an address and license plate number of one of the suspected "terrorists" to Victim 1 and directed Victim 1 to conduct "surveillance."  Victim 1 conducted surveillance as directed by PELUSHI.  After PELUSHI advised Victim 1 that he had proof that the Somerville individuals were "filming" bridges and had met with "fundamentalists" at a mosque, Victim 1 again drove PELUSHI to New York so that PELUSHI could meet with his contacts at the

---

[3]    I know the identity of, and have spoken with, the Lieutenant.

[4]    The Defense Intelligence Agency ("DIA") is a support and intelligence agency for the Department of Defense.

"Joint Terrorism Task Force."  Victim 1 was required to cover the expense of the trip.

16.   In or about 2012, Victim 1 began to drive PELUSHI to meeting with an individual in an official government position (hereinafter, "Official 1").[5]  The meetings took place at Official 1's home and office.  PELUSHI later advised Victim 1 that Official 1 had asked him to conduct "surveillance" of an individual regarding a personal matter.  As directed, Victim 1 conducted surveillance of the individual during 2012 and 2013.

17.   Throughout his "training," PELUSHI regularly set start dates for law enforcement jobs for Victim 1, including at the FBI and later at the CIA.  When the start date arrived, PELUSHI told Victim 1 that the Military Official pushed the start date back.

18.   In 2013, PELUSHI told Victim 1 that he worked with a "Phil Knight" at the CIA.  In January 2014, around the time that Victim 1 believed he was scheduled to begin working at the CIA, PELUSHI told Victim 1 he was traveling to Europe.  After PELUSHI told Victim 1 he had left for Europe, Victim 1 received an email from philknight2014@gmail.com which informed Victim 1 that he would begin his job soon.  Victim 1 provided me with the email (attached hereto as Exhibit 1):

---

[5]     I know the identity of, and have spoken with, Official 1.

8

Hi Mr. [Victim 1].  I have been assigned to monitor your introduction to our firm.  I dont know how much detail George has been allowed to fill you in on. Everything needs to be done before the end of January. That means, your introduction, your polygraph, and also the laws and rules and the protocol. Those take 5 to six business days when you need to be in DC.  After that procedure is done you will have time off to help George finish the TSA case he has been building. After you are done with that, you will show up again on the 1st for an official swear in front of a judge. You will receive your first paycheck on the 1st of next month when you officially get your papers from the firm.  Your monthly paycheck after taxes will be 7,200$, and according to performance there are additional bonuses.  Starting January 8th, tomorrow, you will officially be in our computer system where we can start your introduction to people, and we can explain the protocol more clearly.  I will finish my current case on january 12 and I will fly to Boston to meet with you and hopefully George and all three of us will fly 6pm Eastern time to DC together.  George has gotten into some trouble because his anti- encryption device was found at stockholm airport and I don't kow how long it will take for our people to clear him, but we are doing our best.  But If George cannot make it this week, we have to start your introduction without him so you are ready to start your work/training on Feb1st.  For the first 5 months while you are doing cases under George, you will be training at two of our facilities- one at MIT (technical and legal) , the other near framingham(weapon proficiency and surveillance) I will call you on the 11th, we will meet in boston liberty hotel on the 12th and then fly out of Logan International. Please respond to confirm this email and any questions?  This email account will be deactivated in 6hrs.  Write this code down: lon57021765456.  When I call you repeat this number to me.  After you respond to my email, delete it and also delete the email you send me from your sent mail folder.  Thank you.  Look forward to seeing you.  P.s. Also has George filled you in on his big investigation on TSA leadership (are you familiar with fmr fed [redacted] and a fmr [redacted] cop [redacted]? Me and George have been investigating them for money laundering TSA money with the help of leadership for

the last 3yrs, since you are about to be in our system tomorrow if he hasnt I can fill you in.

19.   In late February 2014, Victim 1 drove (without PELUSHI) to the University and spoke to the Military Official. While the Military Official remembered Victim 1 as a friend of PELUSHI, the Military Official assured Victim 1 that he did not work for the FBI, CIA, or any federal agency and that PELUSHI did not work for him.  Victim 1 then contacted the FBI.

20.   On March 6, 2014, agents consensually recorded a meeting between Victim 1 and PELUSHI.[6]  During this conversation, Victim 1 confronted PELUSHI regarding his meeting with the Military Official the previous week.  PELUSHI chastised Victim 1 for speaking to the Military Official without PELUSHI's knowledge.  Victim 1 mentioned his concern over not having a job.  PELUSHI responded, "I can offer you to find work.  That's it."  Victim 1 stated, "We started something different."  PELUSHI responded, "What started fell through."  Victim 1 found it hard to believe the Military Official was lying, to which PELUSHI responded:

> If you tell these to anyone that works espionage, what
> kind of a response do you expect?  Do you expect him
> to open up with you?  He has never spoken with you
> about these things.  Why the fuck would he open a

---

[6]   The consensually-recorded conversations discussed herein between Victim 1, Victim 2, and PELUSHI took place largely in Albanian.  The recordings were later reviewed and translated into English by a FBI Albanian language specialist.  The transcripts set forth herein are in draft form.

conversation with you?  Whatever he knows about you,
he knows it from me.

21.  Victim 1 asked if there was any documentation of the
training he had undergone, to which PELUSHI responded, "About
you having undergone training on the clandestine service?  There
is no paperwork."  Victim 1 then said, "One piece of paperwork
. . . since we've paid all this money."  PELUSHI then told
Victim 1 that if he wanted money back PELUSHI would pay him
every week.  PELUSHI also offered to get Victim 1 a job with the
State Police or at the State House.

22.  PELUSHI continued to assert that he worked for the FBI
and / or CIA.  PELUSHI complained to Victim 1 that he had to
"intervene" to help Bledar Naco.  In 2013, the FBI (along with
the Winthrop and Revere Police Departments) arrested Naco, an
auxiliary Winthrop police officer and Albanian national, after
he sold cocaine to an undercover police officer.  Naco was
charged with distribution of cocaine and possession with intent
to distribute cocaine.  See United States v. Bledar Naco, Cr.
No. 13-10306-MLW.  PELUSHI told Victim 1 that Naco "screwed me"
because it forced PELUSHI to divulge that he was "FBI
Counterintelligence."  PELUSHI told Victim 1 that after Naco was
arrested, he met with me (I was identified by my first name,
"Jason"), the federal judge on Naco's case ("I've worked for the
judge"), and the U.S. Attorney ("The U.S. Attorney had seen my

face.  He didn't act surprised") in order to secure a favorable result for Naco.  PELUSHI told Victim 1 that it was at this meeting that "Jason" learned that PELUSHI was an FBI agent.

23.  On March 7, 2014, agents again consensually recorded a meeting between Victim 1 and PELUSHI:

| | |
|---|---|
| **PELUSHI:** | Add up the costs. Add up the costs and I will find the money to pay you back.  I'm not joking. |
| **VICTIM 1:** | I was doing the calculations at home last night . . . |
| **PELUSHI:** | Yes? |
| **VICTIM 1:** | It was the car and approximately $20,000 that we've spent together. |
| **PELUSHI:** | Okay.  So $40,000. |
| **VICTIM 1:** | Almost. |
| **PELUSHI:** | Okay. |
| **VICTIM 1:** | So now, there's no paperwork in regards to this? |
| **PELUSHI:** | No.  No. |
| **VICTIM 1:** | When are we gonna try to get some — I mean, aside from this job . . . because like, this is what I don't understand from you, bro, we did all these things, to get in, to get into the FBI, now you are . . . now you're talking about the local State Police. |
| **PELUSHI:** | Like what?  What do you mean State Police? |
| **VICTIM 1:** | Didn't you say you'll get me into the State House? |
| **PELUSHI:** | Yes. |

12

**VICTIM 1:** Okay.  Now, from, from, from . . . the FBI, now all the trainings we did, now we're gonna go with the State House?

**PELUSHI:** Well where do you suggest then?

**VICTIM 1:** Huh?

**PELUSHI:** Where do you suggest?

**VICTIM 1:** Well, what do you think Gjerji?  To spend all this time, all this money that we have spent and that I have spent?  Now to go for the State House?  Because I didn't want to finish up all the conversations yesterday, so that we'd get on each other's nerves.

**PELUSHI:** No, it doesn't bother me at all.  Like, of course we pursued other things, but other things didn't pan out.

**VICTIM 1:** What was this money paid for?

**PELUSHI:** Like?

**VICTIM 1:** What was this money paid for?

**PELUSHI:** On things that I was undertaking to accomplish our goals.  Don't worry.  Forty thousand, I'll find them, maximum three weeks.

24.  Victim 1 identified a Registry of Motor Vehicles photograph of PELUSHI.  Agents identified PELUSHI before, during, and after numerous meetings with Victim 1.

25.  While "working" for PELUSHI, Victim 1 signed a piece of paper containing an oath with an FBI seal on it.  Victim 1 has not seen the paper again after he signed it and provided it to PELUSHI.  In May 2013, while inside the Target Premises, Victim 1 saw a similar piece of paper with an FBI seal on it

13

with another person's name.  Victim 1 took and kept the piece of paper and turned it over to me.  The paper is attached hereto as Exhibit 2.  The name on Exhibit 2 has been redacted but I recognized the name as a known PELUSHI associate.

## PELUSHI'S SCAM OF VICTIM 2

26.  In January 2012, Victim 2 was charged in state court with domestic assault and battery and released on bail.  A friend advised Victim 2 that he should speak to PELUSHI, who was an FBI agent and could help Victim 2 with his court case. Victim 2 met with PELUSHI and PELUSHI confirmed that he was an FBI agent.  PELUSHI assured Victim 2 that he would clear up the criminal case against him.  As a result of his arrest, Victim 2 was angry at his estranged wife (who had gained custody of their child).  PELUSHI told Victim 2 that he could get her deported.

27.  A few months after this meeting, PELUSHI told Victim 2 that through his connections he was able to invest in a Canadian company and urged Victim 2 to invest.  I subsequently viewed the following texts between PELUSHI and Victim 2 on Victim 2's phone:

> **PELUSHI:** [Victim 2] I wanted to ask you about something . . . But don't discuss it with anyone . . . tomorrow I'll put in some money . . . Almost 5000 dollars . . . I will invest it in a company with some [people] from work . . . It's a very good investment . . . it may double almost every month . . . you want to put in like 2000, let me know.

**VICTIM 2:** Ok.  Whatever you want.  I'll leave the house in half an hour and if you want, give me a buzz.

**PELUSHI:** Ok. I'll explain it to you when we talk . . . It's a very good opportunity to make some money without working . . .

28.  Victim 2 gave PELUSHI $3,000.  Around the same time that Victim 2 provided PELUSHI with the money, PELUSHI told Victim 2 that he knew an individual with an official government position (hereinafter, "Official 2").[7]  According to PELUSHI, in addition to his official position, Official 2 was an attorney who would work to get Victim 2's wife deported.  PELUSHI told Victim 2 that Official 2 was willing to take the case but needed a $5,000 retainer.  When Victim 2 complained to PELUSHI that he had not gotten any money back from his earlier $3,000 investment, PELUSHI told Victim 2 to give him $2,000.  PELUHSI advised Victim 2 he would give Official 2 the $2,000 plus the $3,000 that Victim 2 had provided him for the investment for the retainer.

29.  As Victim 2's case proceeded through the state court system, PELUSHI advised Victim 2 that Official 2 was working on getting his wife deported.  PELUSHI explained that Victim 2's criminal case needed to be resolved before there would be action on his wife's deportation.

---

[7]   I know the identity of, and have spoken with, Official 2.

30.  Over the course of many meetings and conversations, PELUSHI told Victim 2 on numerous occasions that he was an FBI agent.  PELUSHI often asked Victim 2 to pick him up in his car. During these rides, PELUSHI pointed out locations that PELUSHI claimed were connected to "cases" he was working on.  PELUSHI regularly asked Victim 2 to drop him off and pick him up in front of the FBI's Boston headquarters and referred to the location as his "office."  Victim 2 advised that on about ten occasions between September 2013 and January 2014, Victim 2 accompanied PELUSHI to conduct "surveillance" on the individual for Official 1.  Victim 2 also advised that he drove PELUSHI to New York several times so that PELUSHI could "brief" superiors in the FBI or CIA.

31.  Victim 2 advised that in 2013, PELUSHI twice told Victim 2 that Official 2 needed money to pay for a private investigator to look into Victim 2's wife.  Victim 2 advised that, on the first occasion, Victim 2 gave PELUSHI $2,500 to give to Official 2; on the second, Victim 2 gave PELUSHI $200. According to Victim 2, PELUSHI told Victim 2 that he had spoken to his counterpart at "Immigration" and leaned that Victim 2's wife was scheduled to be deported in September 2013.  PELUSHI subsequently advised Victim 2 that the deportation date had been delayed, first to November 2013, and then to December 2013.

32.   In January 2014, Victim 2 was found not guilty of assault and battery after trial.  A few days later, Victim 2 drove PELUSHI from New York to Boston (PELUSHI claimed he had just returned from Europe) and told him about the verdict. Victim 2 advised that PELUSHI asked Victim 2 for the details of the trial to make sure that his "people did their job."  PELUSHI also told Victim 2 that the deportation proceeding against his wife would now proceed.  When Victim 2 told PELUSHI he wanted the money refunded and the deportation request dropped, PELUSHI told Victim 2 that the money could not be refunded because Official 2 and one of PELUSHI's "people" were actively working on the case.

33.   Unbeknownst to PELUSHI, in 2013, Victim 2 had met Victim 1.  Victim 1 eventually told Victim 2 that he had worked with PELUSHI for years, that PELUSHI was a liar, and not to give PELUSHI any more money.

34.   On March 4, 2014, Victim 2 had a consensually recorded meeting with PELUSHI while Victim 2 drove PELUSHI to the University, ostensibly so that they could meet PELUSHI's immigration contact and discuss the deportation of Victim 2's wife.  Victim 2 asked, "Is this an FBI agent like you?" and PELUSHI responded, "No, this is an ICE agent."  When Victim 2 asked if more money would be needed, PELUSHI said, "Not a cent, not a cent more!"  Victim 2 then stated, "Since we paid $7700,

17

maybe we should give some more so at least . . . this can be a done deal."  PELUSHI interrupted and said, "No, not a penny more."

35.  Later in the conversation, Victim 2 asked PELUSHI what "ICE" is.  PELUSHI stated, "That's the enforcement police.  The ones that grab and remove you.  Immigration Customs Enforcement."  Victim 2 asked PELUSHI, "Does he know that you're an FBI agent?"  To which PELUSHI replied, "Yes, yes.  [Official 2] doesn't know."  Victim 2 asked, "Oh, [Official 2] doesn't know that you're an FBI agent?"  PELUSHI responded, "No, he doesn't know me at all.  He's a close friend of [Official 1]."  As noted above, by this point, Victim 1 had met with the Military Official.  The Military Official later advised agents that on March 4, 2014, PELUSHI came by his office at the University.  The Military Official told PELUSHI to go away.  Agents observed PELUSHI meet with the Military Official while Victim 2 waited outside.

36.  On April 24, 2014, agents consensually recorded a meeting between Victim 2 and PELUSHI.  During this conversation PELUSHI assured Victim 2, again, that his wife's deportation was proceeding.  PELUSHI told Victim 2 that Bledar Naco had recently been questioned about whether PELUSHI was an agent.  PELUSHI told Victim 2 that if anyone asked he was to deny any knowledge of where PELUSHI worked.  Finally, PELUSHI talked about his work

during the Boston Marathon.   Victim 2 asked whether PELUSHI was
armed during the marathon:

> **PELUSHI:**   Yeah, yeah, weapons on.
>
> **VICTIM 2:**   Weapons on, huh?
>
> **PELUSHI:**   Yeah, and also we had the order that, if you tell someone to stop and they reach for the bag, shoot them in the head!
>
> **VICTIM 2:**   Man!   So this was an order, huh?
>
> **PELUSHI:**   An order!   Actually, from the Director! If you tell someone to stop and they reach for the bag, shoot them in the head!   Bullet to the head, you understand!
>
> **VICTIM 2:**   Wow . . .
>
> You, do you . . .
>
> **PELUSHI:**   There were snipers above.
>
> **VICTIM2:**   Gjerji, do you have special weapons or the same as the police?
>
> **PELUSHI:**   Oh, yes, yes, yes.   We have some that are more, heavy duty.
>
> **VICTIM 2:**   In other words more . . .
>
> **PELUSHI:**   With bullets that are more . . . like generally, one bullet gets you and then. . .
>
> **VICTIM 2:**   It paralyzes you.
>
> **PELUSHI:**   We also have better training.   For example, when it comes to shooting guns we don't ever err, you understand?   Generally one bullet.
>
> **VICTIM 2:**   Well, certainly if you're an FBI agent you have undergone a lot of courses, you've had training, with guns, with . . .

**PELUSHI:** Yes, yes.  The gun is the key thing, you understand . . .

**VICTIM 2:** So it's paralyzing . . .

**PELUSHI:** Yes, yes.

**VICTIM 2:** Undoubtedly the FBI has other . . . Doesn't have the same training that a simple cop does . . . right? What conditions, Gjerji, must you fulfill to become an FBI agent?

**PELUSHI:** It's not about conditions . . .

**VICTIM 2:** Like you are . . .

**PELUSHI:** It's what there's a need for.

**VICTIM 2:** What?

**PELUSHI:** It's what the FBI is in need of.  Sometimes it needs some former cops that deal with some, like each one . . . whereas us who are counter-espionage are people who have completed, each section, you understand?

**VICTIM 2:** Oh, so you cover counter . . .

**PELUSHI:** Yes.

**VICTIM 2:** . . . counter-espionage.

**PELUSHI:** Yes, yes.

37. During April and May 2014, agents consensually recorded several conversations between PELUSHI and Victim 2 where PELUSHI assured Victim 2 that his wife's deportation was proceeding (by this time, unbeknownst to PELUSHI, Victim 2 had reconciled with his wife).  On May 9, 2014, Victim 2 advised that PELUSHI reported that Official 2 needed another $7,000 to continue the deportation case against Victim 2's wife.  Later

20

that day, agents consensually recorded a conversation between Victim 2 and PELUSHI where Victim 2, at agents' direction, asked for PELUSHI's assurance that Official 2 would keep working on the case:

> **VICTIM 2:** So now, what does [Official 2] say? How . . . is he handling things? I mean does he guarantee [the outcome] or . . .
>
> **PELUSHI:** Yes, yes.
>
> **VICTIM 2:** Because the problem is that . . .
>
> **PELUSHI:** Yes, yes, yes, yes, yes.
>
> **VICTIM 2:** Because I'm concerned that . . .
>
> **PELUSHI:** He, he . . .
>
> **VICTIM 2:** You know what my concern is, because maybe he wants to again get into elections and such and he's looking for . . .
>
> **PELUSHI:** No, no, no.
>
> **VICTIM 2:** . . . for more money.
>
> **PELUSHI:** No, no, no.

38.  Over the next few days, agents consensually recorded several conversations and documented text message exchanges between Victim 2 and PELUSHI, during which Victim 2 arranged to pay PELUSHI $1,500 for Official 2.  On May 14, 2014, agents provided Victim 2 with $1500 in OGC and directed Victim 2 to meet with PELUSHI.  During a consensually recorded meeting, Victim 2 provided PELUSHI with $1,500 in OGC (the recording

captured PELUSHI counting the money).   PELUSHI assured Victim 2

that Official 2 would not string him along.

## PELUSHI DIRECTS VICTIM 2 TO LIE ABOUT HIM

39.   On June 18, 2014, agents provided Victim 2 with a

grand jury subpoena for July 8, 2014, and the business card of

an FBI agent.   Agents then directed Victim 2 to contact PELUSHI

and arrange a meeting.   Later that day, agents consensually

recorded a meeting between Victim 2 and PELUSHI.   Victim 2 told

PELUSHI that "they got me so frazzled this morning" because

"[o]ne of the FBI, from your work, came to my home."   Victim 2

showed PELUSHI the subpoena and business card:

> **PELUSHI:** Surprising.  I'm amazed.  What did this one
> ask you?
>
> **VICTIM 2:** He said, "Do you know – do you know George –
> do you know Gjerji Pelushi?"
>
> **PELUSHI:** Did you tell him that I work there or no?
> Did you tell him that –
>
> **VICTIM 2:** No, I didn't answer him because I didn't
> know what to say –
>
>                                                          * * *
>
> **VICTIM 2:** Now, if they ask me –
>
> **PELUSHI:** You tell them "I don't know."
>
> **VICTIM 2:** – for example, like, "Where does Gjerji
> work?"
>
> **PELUSHI:** Yeah . . . "I don't know," tell them.
>
> **VICTIM 2:** I don't know.

**PELUSHI:**  No.  Tell them, "I don't know.  I don't know where he works."

**VICTIM 2:**  So that . . .

**PELUSHI:**  No, no, no, because I – I . . . see, this is what they want to do . . . because when I . . . I don't tell anyone about that stuff, but I've told a few people and they want to stop me from getting a promotion.  FBI, you understand?

**VICTIM 2:**  No, man, I was – I was concerned because . . . the problem is that he told me, "You have to come to court."

**PELUSHI:**  Yes.  Well, ask him what the court is all about. Ask him.

**VICTIM 2:**  I will ask him, undoubtedly.

**PELUSHI:**  And then don't call me any more from this number, you understand?

**VICTIM 2:**  Okay.

**PELUSHI:**  Go see him today.

**VICTIM 2:**  I can go see him, but what shall I tell him?

**PELUSHI:**  Tell him, "I have a divorce proceeding."

**VICTIM 2:**  Right!

**PELUSHI:**  Right?  "I have a divorce" – If he says, because he knows whom they've spoken with, maybe they forced [Victim 1], because I haven't seen [Victim 1] . . .

**VICTIM 2:**  I don't know.

**PELUSHI:**  You understand?  So just tell them, "I've been to court . . .", tell them, "about divorce.  Gjerji has helped me with legal [counsel]" and tell them, "I know he works something in genetics." Genetics.

40. During the remainder of the conversation, PELUSHI directed Victim 2 to meet up with him after Victim 2 met with the FBI agent; told Victim 2 not to use his phone number to contact him; reiterated that Victim 2 was to tell the FBI agent that PELUSHI worked in "genetics"; and devised a code to use when Victim 2 contacted him over the new phone ("Just say, 'How did your blood work go?' Send me a text . . . and I'll tell you the place I'm at so we can meet").

41. Victim 2 subsequently advised agents that on the evening of June 18, 2014, PELUSHI and a second man, later identified as Bledar Naco, came by Victim 2's home. Victim 2 advised that PELUSHI wanted to see and take the grand jury subpoena from Victim 2. When Victim 2 said that he had left the items at work, PELUSHI said that he and Naco would drive Victim 2 to work to get it. PELUSHI repeated his earlier instruction that Victim 2 could not tell anyone PELUSHI was an FBI agent (PELUSHI explained that the fact that Victim 2 knew he was an agent was a breach of protocol). PELUSHI told Victim 2 that he was to say he works in genetics as this was PELUSHI's cover.

42. Victim 2 identified a Registry of Motor Vehicles photograph of PELUSHI. Agents identified PELUSHI before, during, and after numerous meetings with Victim 2.

## FOLLOW UP INVESTIGATION

43.   In addition to the Victims, I have interviewed Official 1, Official 2, the Military Official, the Lieutenant, and others.

44.   Official 1 advised that he met PELUSHI in 2011.   When they met, PELUSHI advised Official 1 that he worked for the DIA. PELUSHI offered, and Official 1 agreed, to have PELUSHI conduct surveillance of the individual for Official 1.   According to Official 1, PELUSHI periodically updated him on the whereabouts and activities of the individual for a period of three years. PELUSHI did not ask for money but asked for favors, including employment (Official 1 denied helping friends of PELUSHI obtain jobs).   In 2012, Official 1's child was diagnosed with a serious illness.   When he told PELUSHI about the diagnosis, PELUSHI told Official 1 that he was a geneticist who had attended the University and was aware of a planned University research study that could help his child.[8]   PELUSHI told Official 1 that through his training in genetics and his work at the DIA, he could get his child placed into the study.   Since then, PELUSHI has repeatedly told Official 1 that the study has been delayed.

45.   Official 2 advised that in addition to his work in an official government position, he was an attorney who maintained

---

[8]   According to the University, PELUSHI did not attend or graduate from the school.

a private law practice, focusing on criminal and civil law. He does not now, nor has he ever, practiced immigration law. Official 2 was shown a single photograph of PELUSHI. Official 2 advised that he did not recognize PELUSHI as a former or current client or someone he had contact with in the course of his official duties.

46. The Military Official advised that PELUSHI came by his office one day to introduce himself as a University graduate (with a degree in genetics) who had previously done an internship at the University. PELUSHI frequently stopped by the Military Official's office at the University to discuss politics and current events. In late February 2014, Victim 1 came by the Military Official's office. The Military Official vaguely recalled PELUSHI introducing him to Victim 1. The Military Official recalled Victim 1 asking the Military Official for a letter of reference or something in writing to confirm Victim 1's work with PELUSHI and the CIA. Victim 1 appeared to believe that the Military Official worked for the CIA and that both he and PELUSHI worked for him. The Military Official told Victim 1 that he did not work for the CIA and that PELUSHI did not work for him.

47. The Lieutenant advised that he met PELUSHI about three years ago. When they first met, PELUSHI told the Lieutenant that he worked for the DIA. Since then, PELUSHI has repeatedly

told the Lieutenant that he works for the DIA.  As recently as
March 2014, PELUSHI told the Lieutenant he traveled to
Switzerland and helped conduct an interrogation on behalf of the
FBI.  The Lieutenant advised that he never provided any "tip" to
PELUSHI to investigate suspected terrorists in Somerville or
anywhere else.

48.  On June 6, 2014, Victim 1 consented to a search of his
cellular telephone.  During the search, I retrieved
approximately 6,000 texts between Victim 1 and PELUSHI.  Most of
the texts are in Albanian or are a mix of English and Albanian.
A preliminary review indicated that the texts included
references to many of the things Victim 1 said he spoke to
PELUSHI about, including sums of money, jobs, New York,
Somerville, and the name of the Military Official.

49.  According to a query of the FBI's employee database,
PELUSHI is not an employee of the FBI.

**OTHER EVIDENCE THAT PELUSHI RESIDES AT THE TARGET PREMISES**

50.  According to the Registry of Motor Vehicles, PELUSHI's
home address is listed as 282 Main Street, Apartment 1B,
Melrose, Massachusetts.  During the course of this
investigation, I and other agents that I work with have
personally observed PELUSHI enter and exit 282 Main Street in
Melrose.  Victim 1 has been inside the Target Premises on many
occasions with PELUSHI and advised that PELUSHI lives at the

Target Premises with his parents.  Victim 1 advised that the
Target Premises includes two bedrooms: one for PELUSHI and one
for his parents (as noted above, I am not requesting permission
to search the bedroom of PELUSHI's parents).

## THE REQUEST TO SEARCH THE TARGET PREMISES

51.  I request permission to search the Target Premises
(i.e., PELUSHI's bedroom and the common areas of 282 Main
Street, Apartment 1B, Melrose, Massachusetts, as well as any
storage area set aside for Apartment 1B at 282 Main Street).
Based on the information set forth above, there is probable
cause to believe that the Target Premises contain fruits,
evidence, and instrumentalities of violations of the federal
statute listed above, as described in Attachment B.

52.  First, I seek permission to search the Target Premises
for documents used by PELUSHI to perpetuate his fraud, such as
those set forth in Exhibits 1 and 2.  Based on my training and
experience, and based on the training and experience of other
agents with whom I have spoken, individuals involved in frauds
such as the one described herein routinely create, use, and send
documents to provide some kind of official imprimatur to the
fraud.  In this case, PELUSHI appears to have created a false
document marked with an FBI seal as a "prop" to convince the
reader that he was, in fact, an FBI agent.  Victim 1 has been
inside the Target Premises and has seen what appeared to be a

diploma from the University hanging on the apartment wall. As noted above, the University in question has advised agents that PELUSHI never attended or graduated from the school. Given PELUSHI's longstanding connection to the Target Premises and the number of times agents have seen PELUSHI coming and going from 282 Main Street, it is reasonable to assume that the Target Premises serve as PELUSHI's "home base" and that documents used to perpetuate his fraud would be located there. I also seek permission to search for documents or items that confirm PELUSHI's residence at or connection to the Target Premises.

53. I also request permission to search for U.S. currency or bank or other financial records of PELUSHI at the Target Premises. Throughout this investigation, agents routinely conducted surveillance of PELUSHI and the Target Premises. Agents have not identified any regular place of employment for PELUSHI. In March 2014, PELUSHI applied to become a naturalized United States citizen. On his application form, PELUSHI advised that he had been unemployed for the past five years. Also, in June 2014, PELUSHI accepted $1,500 in serialized OGC from Victim 2, ostensibly to provide to Official 2 to continue to work to deport Victim 2's wife, which could still be located inside the Target Premises.

54. I also request permission to search for a laptop computer inside the Target Premises and to search the laptop if

seized from the Target Premises.  During the investigation,
PELUSHI appears to have sent an email purporting to be from a
"Phil Knight" who advised Victim 1 that he was to start his job
with the CIA in the near future.  Within the past year Victim 1
has also seen PELUSHI with a laptop computer inside the Target
Premises (which could have been used to create and send the
fraudulent FBI document or the "Phil Knight" email).

55.  From my training, experience, and information provided
to me by other agents, I am aware that individuals frequently
use computers to create and store records of their actions by
communicating about them through e-mail, instant messages, and
updates to online social-networking websites; drafting letters;
keeping their calendars; arranging for travel; storing pictures;
researching topics of interest; buying and selling items online;
and accessing their bank, financial, investment, utility, and
other accounts online.  I am also aware that the Consumer
Electronics Association estimated that in 2010, 86 percent of
all U.S. households owned at least one computer.

56.  From my training and experience, I am aware that
personal computer systems are capable of creating, receiving,
and otherwise processing computer files such as the email and
word processing documents described in Exhibits 1 and 2.

57.  From my training and training, experience, and
information provided to me by other agents, I am aware that

individuals commonly store records of the type described in
Attachment B in computer hardware, computer software, computer-
related documentation, and storage media.

58.   I request permission to search for and seize the
cellular telephone associated with the 8054 Number inside the
Target Premises.   I request permission to search for and seize
any cellular telephone located inside the Target Premises (i.e.,
PELUSHI's room and the common area of Apartment 1B) that is
identified as belonging to PELUSHI.   I also request permission
to search the cellular telephone associated with the 8054 Number
and any cellular telephones so seized.   As in this case, I know
from my training and experience that those who perpetrate frauds
such as the one described herein stay in contact with their
victims using cellular telephones (by phone or text message).   A
cellular telephone could be located anywhere within the Target
Premises.   Here, PELUSHI used the cellular telephone associated
with the 8054 Number to speak to and exchange text messages with
Victim 1 and Victim 2.   Bills and other documents relating to
the usage of cellular telephones and the information which is
frequently stored within it (such as telephone listings, speed
dialing features, and voice mail) are also likely to be present
in the residence and will confirm prior contacts with the
Victims.   Moreover, many cellular telephones are, in essence,
small computers, and can perform many if not all of the same

functions of a laptop computer, including accessing, sending, and receiving emails and text messages and creating word processing documents.

59.   Based on my training and experience and my work on this investigation, I am aware that records including the type described in Attachment B can be found on computer hardware, computer software, and storage media contained in a laptop computer or a cellular telephone (collectively, "computer equipment").   Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.   Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has

used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

58.  Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed

by a qualified computer specialist in a laboratory setting
rather than in the location where it is seized.  This is true
because of:

a. The volume of evidence — storage media such as hard
disks, flash drives, CD-ROMs, and DVD-ROMs can store
the equivalent of thousands or, in some instances,
millions of pages of information.  Additionally, a
user may seek to conceal evidence by storing it in
random order or with deceptive file names.  Searching
authorities may need to examine all the stored data to
determine which particular files are evidence, fruits,
or instrumentalities of criminal activity.  This
process can take weeks or months, depending on the
volume of data stored, and it would be impractical to
attempt this analysis on-site.

b. Technical requirements — analyzing computer hardware,
computer software or storage media for criminal
evidence is a highly technical process requiring
expertise and a properly controlled environment.  The
vast array of computer hardware and software available
requires even computer experts to specialize in some
systems and applications.  Thus, it is difficult to
know, before the search, which expert possesses
sufficient specialized skill to best analyze the
system and its data.  Furthermore, data analysis
protocols are exacting procedures, designed to protect
the integrity of the evidence and to recover even
"hidden," deleted, compressed, password-protected, or
encrypted files.  Many commercial computer software
programs also save data in unique formats that are not
conducive to standard data searches.  Additionally,
computer evidence is extremely vulnerable to tampering
or destruction, both from external sources and
destructive code imbedded in the system as a "booby
trap."  Consequently, law enforcement agents may
either copy the data at the premises to be searched or
seize the computer equipment for subsequent processing
elsewhere.

59.  The premises may contain computer equipment whose use
in the crime(s) or storage of the things described in this

warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how their contents or ownership appear or are described by others at the scene of the search.

## CONCLUSION

60.  Based on the information set forth above, I submit that there is probable cause to believe that PELUSHI has committed the offenses set forth in the accompanying criminal complaint.  Moreover, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of this crime, as set forth in Attachment B, are contained within the Target Premises as described in Attachment A.

I, JASON D. COSTELLO, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

Signed under the pains and penalties of perjury this 31st day of July, 2014.

_____
JASON D. COSTELLO
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 31st day of July, 2014.

_____
THE HONORABLE JENNIFER C. BOAL
Chief United States Magistrate Judge
District of Massachusetts

36

Exhibit 1

## Fwd: friend of l.ons









Begin forwarded message:

**From:** phil knight <philknight2014@gmail.com>
**Date:** January 7, 2014 at 10:57:31 AM EST
**To:**
**Subject: friend of l.ons**

Hi              I have been assigned to monitor your introduction to our firm.
I dont know how much detail George has been allowed to fill you in on.
Everything needs to be done before the end of January.  That means, your
introduction, your polygraph, and also the laws and rules and the protocol.
Those take 5 to six business days when you need to be in DC.  After that
procedure is done you will have time off to help George finish the TSA case he
has been building.  After you are done with that, you will show up again on the
1st for an official swear in front of a judge.  Ýou will receive your first
paycheck on the 1st of next month when you officially get your papers from the
firm.  Your monthly paycheck after taxes will be 7,200$, and according to
performance there are additional bonuses.  Starting January 8th, tomorrow, you
will officially be in our computer system where we can start your introduction

to people, and we can explain the protocol more clearly.  I will finish my current case on january 12 and I will fly to Boston to meet with you and hopefully George and all three of us will fly 6pm Eastern time to DC together. George has gotten into some trouble because his anti- encryption device was found at stockholm airport and I dont know how long it will take for our people to clear him, but we are doing our best. But If George cannot make it this week, we have to start your introduction without him so you are ready to start your work/training on Feb1st. For the first 5 months while you are doing cases under George, you will be training at two of our facilities- one at MIT (technical and legal) , the other near framingham(weapon proficiency and surveillance) I will call you on the 11th, we will meet in boston liberty hotel on the 12th and then fly out of Logan International. Please respond to confirm this email and any questions?  This email account will be deactivated in 6hrs.
 Write this code down: lon57021765456.  When I call you you repeat this number to me.  After you respond to my email, delete it and also delete the email you send me from your sent mail folder.  Thank you.  Look forward to seeing you.  P.s. Also has George filled you in on his big investigation on TSA leadership (are you familiar with fmr fed ████████ and a fmr ████████ cop ████████████ Me and George have have been investigating them for money laundering TSA money with the help of leadership for the last 3yrs, since you are about to be in our system tomorrow if he hasnt I can fill you in.

# Exhibit 2



## FEDERAL BUREAU OF INVESTIGATION.   BOSTON OFFICE

I ▮▮▮▮▮ fully submit my testimony to Special Agent Richard

Falkreinth.  I swear that the testimony is

the full truth as I know it.

_____          03/18/11
Signature                         Date

**FBI WARNING**

Federal law provides severe civil
and criminal penalties for the unau-
thorized reproduction, distribution
or exhibition of copyrighted motion
pictures, video tapes
or video discs.

Criminal copyright infringement is
investigated by the FBI and may
constitute a felony with a maximum
penalty of up to five years in prison
and/or a $250,000 fine.